UNITED STATES DISTRICT COURT
District of Minnesota
Criminal No. 17-107 (DWF/TNL)

UNITED STATES OF AMERICA,

Plaintiff,

v.

(1)   MICHAEL MORRIS,
      a/k/a Bill,
(2)   CHATARAK TAUFFLIEB,
      a/k/a Maya,
(3)   PEERACHET THIPBOONNGAM,
      a/k/a Arm,
(4)   PAWINEE UNPRADIT,
      a/k/a Fon,
      a/k/a Jamjit Unpradit,
      a/k/a Pawinee Kiertivadthananod,
(5)   SAOWAPHA THINRAM,
      a/k/a Nancy,
      a/k/a Kung,
(6)   GREGORY ALLEN KIMMY,
      a/k/a Fat P,
(7)   WILAIWAN PHIMKHALEE,
      a/k/a Pim,
      a/k/a Paula,
      a/k/a Mona,
      a/k/a Chompoo,
(8)   KANYARAT CHAIWIRAT,
      a/k/a Pan,
(9)   PORNTHEP SUKPRASERT,
      a/k/a Ouu,
(10)  MULCHULEE CHALERMSAKULRAT,
      a/k/a Mint,
(11)  BHUNNA WIN,
      a/k/a Bhunna Siriangkhunwanish,
(12)  NATCHANOK YUVASUTA,
      a/k/a Nut,
(13)  NATTAYA LEELARUNGRAYAB,
(14)  PEERASAK GUNTETONG,
(15)  VEERAPON GHETTALAE,

**SUPERSEDING
INDICTMENT**

18 U.S.C. § 2
18 U.S.C. § 371
18 U.S.C. § 981
18 U.S.C. § 982
18 U.S.C. § 1591
18 U.S.C. § 1594
18 U.S.C. § 1952
18 U.S.C. § 1956
18 U.S.C. § 1957
18 U.S.C. § 1960
18 U.S.C. § 2421
21 U.S.C. § 853
28 U.S.C. § 2461

1

SCANNED
AUG 15 2017
U.S. DISTRICT COURT MPLS

(16)  THOUCHARIN RUTTANAMONGKONGUL,
         a/k/a Ann,
         a/k/a Noiy,
(17)  MATTHEW MINTZ,
(18)  MOHIT TANDON,
(19)  RICHARD ALEXANDER,
(20)  WARALEE WANLESS,
         a/k/a Wan,
         a/k/a Waralee Duarte,
         a/k/a Waralee Alcaraz,
(21)  TANAKRON PATRATH,
         a/k/a Toom, and
(22)  PANWAD KHOTPRATOOM,
         a/k/a Du,
         a/k/a Pam,

Defendants.

THE UNITED STATES GRAND JURY CHARGES THAT:

## OVERVIEW OF THE SEX TRAFFICKING ORGANIZATION

1.     The defendants, along with others known and unknown to the grand jury, were members of a large-scale international sex trafficking organization. Through the use of overwhelming bondage debt and other means of force, threats of force, fraud, and coercion, the organization trafficked women from Thailand to cities across the United States, where the women were forced to engage in countless commercial sex acts for the financial benefit of the criminal enterprise. The women did not have freedom of movement and, until they paid off their bondage debts, were modern day sex slaves.

2.     Since at least 2009 and continuing until the present, the sex trafficking organization trafficked hundreds of women from Bangkok, Thailand, to various cities across the United States, including Minneapolis, Los Angeles, Chicago, Atlanta,

Phoenix, Washington, D.C., Las Vegas, Houston, Dallas, Seattle, and Austin. The victims of the organization were often from impoverished backgrounds and spoke little English. Members of the criminal organization recruited these victims from Thailand with promises of a better life in the United States. The organization then engaged in widespread visa fraud in order to transport the victims to the United States.

3.     Once in the United States, the criminal organization sent the victims to "houses of prostitution" located in cities across the country. There, the victims were forced to work long hours—often all day, every day—having sex with strangers in order to attempt to pay down their bondage debts. The victims were isolated. They typically did not have the ability to choose who they have sex with, what sex transactions they would engage in, or when they would have sex. Until they paid off their exorbitant bondage debts—often between $40,000 and $60,000—the victims were effectively "owned" by the organization.

4.     At various times, the organization operated out of at least seven identified houses of prostitution in the Minneapolis area. The criminal organization rotated victims through houses of prostitution in cities across the United States and, as a result, more than a dozen victims were trafficked through Minnesota. Moreover, the leaders of and co-conspirators in this sex trafficking organization based in Bangkok, Thailand—Individual A and Individual B—opened and operated the Minnesota houses of prostitution.

## DEFENDANTS AND THEIR ROLES

5.      At all times relevant to this superseding indictment, the defendants and other members of the criminal conspiracy, both known and unknown to the grand jury, worked together to (1) coordinate the movement of women from Thailand into and across the United States, where the women engage in commercial sex acts for the financial benefit of the organization, and (2) to launder the millions of dollars in illegal proceeds generated by the commercial sex trafficking operation. A number of different roles in the criminal organization were held by members of the conspiracy and it was not uncommon for a member of the conspiracy to hold more than one role either over time or simultaneously in order to maximize profit. The roles in the criminal conspiracy held by the defendants included:

a.      Defendants      PAWINEE      UNPRADIT,      WILAIWAN PHIMKHALEE, and WARALEE WANLESS served as traffickers. The traffickers were the individuals to whom the victims of sex trafficking owed some or all of their bondage debts. Thailand-based traffickers recruited the victims directly in Thailand and facilitated their transport to the United States. While traffickers in Thailand at times held the bondage debt of a victim until it was fully repaid, on other occasions Thailand-based traffickers sold the bondage debts of victims to traffickers in the United States (individuals who typically served in the dual role of trafficker and house boss). Such was the case with defendants PHIMKHALEE and WANLESS, both of whom "bought" the bondage debts of victims from traffickers in Thailand.

4

b.     Defendants MICHAEL MORRIS, CHATARAK TAUFFLIEB, UNPRADIT, SAOWAPHA THINRAM, GREGORY ALLEN KIMMY, PHIMKHALEE, KANYARAT CHAIWIRAT, THOUCHARIN RUTTANAMONGKONGUL, WANLESS and PANWAD KHOTPRATOOM acted as "house bosses" in the cities of Los Angeles, Dallas, Austin, Chicago, and Houston. House bosses "owned" one or more of the houses of prostitution, which were in fact apartments, hotels, houses, and massage parlors. The organization used these locations throughout the United States to conduct its sex trafficking operation. House bosses ran the day-to-day operations at the houses of prostitution, which included advertising the trafficking victims for commercial sex acts (or "dates"), procuring and maintaining the houses of prostitution, scheduling sex buyers (or "Johns"), and ensuring that a portion of the cash (typically 60%) made by the victims was routed back to the boss/trafficker to pay down the bondage debts. House bosses coordinated with traffickers and with one another to facilitate the travel of victims to different houses of prostitution located in cities across the United States, travel costs that were added to the victims' bondage debts. In return for their services, the house bosses retained a significant portion of the cash (typically 40%) the victims received from the commercial sex acts.

c.     Defendants PEERACHET THIPBOONNGAM, PORNTHEP SUKPRASERT, MULCHULEE CHALERMSAKULRAT, BHUNNA WIN, NATCHANOK YUVASUTA, NATTAYA LEELARUNGRAYAB, PEERASAK GUNTETONG, VEERAPON GHETTALAE, and TANAKRON PATRATH served as money launderers for the commercial sex trafficking organization. The criminal

organization dealt primarily in cash and relied upon these money launderers for the successful and continued operation of the sex trafficking enterprise. Specifically, these money launderers made their bank accounts available and coordinated the deposit of cash generated from the commercial sex trafficking into accounts they controlled and then coordinated subsequent withdrawals as well as other transfers of funds, including in amounts greater than $10,000, generally and in an effort to conceal the source of the funds, to avoid reporting requirements, and to promote the commercial sex operation. The money launderers also coordinated the procurement and movement of money in and back to Thailand as payment for the bondage debts owed by the trafficking victims, to promote the continued operation of the commercial sex trafficking organization, to conceal the proceeds from the sex trafficking operation, and to avoid reporting requirements. During the time period of the superseding indictment, these individuals laundered millions of dollars that constituted the proceeds of the human trafficking described in this superseding indictment.

   d. Defendants PEERACHET THIPBOONNGAM, MATTHEW MINTZ, MOHIT TANDON, RICHARD ALEXANDER, and TANAKRON PATRATH served as "facilitators" for the organization, assisting in the commercial sex organization with all manner of needs, including renting houses of prostitution, facilitating the transport of the trafficking victims, entering into fraudulent marriages with high-level members of the criminal conspiracy so those members

could gain immigration status in the United States, and assisting with the money laundering activities of the organization.

## COUNT 1
Conspiracy To Commit Sex Trafficking
18 U.S.C. § 1594

## THE CONSPIRACY

6.     The allegations contained in paragraphs 1 through 5 of this superseding indictment are re-alleged as if stated in full herein.

7.     From in or about January 2009 through in or about May 2017, in the State and District of Minnesota and elsewhere, the defendants,

**MICHAEL MORRIS,**
**a/k/a Bill,**
**CHATARAK TAUFFLIEB,**
**a/k/a Maya,**
**PEERACHET THIPBOONNGAM,**
**a/k/a Arm,**
**PAWINEE UNPRADIT,**
**a/k/a Fon,**
**a/k/a Jamjit Unpradit,**
**a/k/a Pawinee Kiertivadthananod,**
**SAOWAPHA THINRAM,**
**a/k/a Nancy,**
**a/k/a Kung,**
**GREGORY ALLEN KIMMY,**
**a/k/a Fat P,**
**WILAIWAN PHIMKHALEE,**
**a/k/a Pim,**
**a/k/a Paula,**
**a/k/a Mona,**
**a/k/a Chompoo,**
**KANYARAT CHAIWIRAT,**
**a/k/a Pan,**
**NATCHANOK YUVASUTA,**
**a/k/a Nut,**

**THOUCHARIN RUTTANAMONGKONGUL,**
**a/k/a Ann,**
**a/k/a Noiy,**
**MATTHEW MINTZ,**
**MOHIT TANDON,**
**RICHARD ALEXANDER,**
**WARALEE WANLESS,**
**a/k/a Wan,**
**a/k/a Waralee Duarte,**
**a/k/a Waralee Alcaraz,**
**TANAKRON PATRATH,**
**a/k/a Toom, and**
**PANWAD KHOTPRATOOM,**
**a/k/a Du,**
**a/k/a Pam,**

did, in and affecting interstate and foreign commerce, knowingly conspire with one another and others, known and unknown to the grand jury, to recruit, entice, harbor, transport, provide, obtain, and maintain, by any means, a person, and benefited, financially and by receiving anything of value, from participation in a venture which engaged in the previously described acts, and knowing that means of force, threats of force, fraud, coercion, and any combination of such means would be used to cause the person to engage in a commercial sex act, and attempted to do so, in violation of Title 18, United States Code, Sections 1591(a), 1591(b)(1), and 1594(a).

## THE PURPOSE OF THE CONSPIRACY

8.    The purpose of the conspiracy was for the sex trafficking organization to make money by arranging for women to travel from Bangkok, Thailand to the United States and, at various houses of prostitution in cities throughout the United States, engage in innumerable commercial sex acts for the financial benefit of the criminal organization.

## THE MANNER AND MEANS OF THE CONSPIRACY

9.      To achieve the purpose of the conspiracy, the defendants recruited victims from Thailand, entered into bondage debt "contracts" with the victims, facilitated the travel of the victims from Thailand to the United States by engaging in widespread visa fraud, advertised the victims for commercial sex in the United States, arranged and facilitated such transactions, isolated and moved the women between various houses of prostitution in the State and District of Minnesota and elsewhere, and engaged in the process of laundering the illicit proceeds in the State and District of Minnesota and elsewhere. In particular, the defendants, together with others known and unknown to the grand jury, committed the following acts.

### The Recruitment in Thailand

10.     Members of the conspiracy recruited women in Thailand to enter into debt bondage "contracts" with the criminal organization. The victims of the sex trafficking organization were typically women from impoverished backgrounds. When a victim entered into the debt bondage "contract," the victim generally agreed to incur a significant debt—one which, in her native country, neither the victim nor her family could ever hope to repay—in exchange for a visa and travel to the United States. The bondage debt amount far exceeded the actual expenses the trafficker incurred to bring the victim to the United States.

11.     Prior to transporting the victims to the United States, the organization typically arranged to have professional-quality escort-style photographs of the victims in lingerie and in various states of undress taken in Thailand. These

photographs were sent from the traffickers in Thailand to various members of the conspiracy in the United States and were ultimately used to advertise the victims for commercial sex transactions, often on websites such as backpage.com and eros.com.

12.     Traffickers often encouraged the victims to undergo breast augmentation or other plastic surgery in Thailand in order to make the victims more "appealing" to potential sex buyers in the United States. Traffickers added the cost of the plastic surgery to the victims' already significant bondage debts.

13.     The organization also facilitated the international transportation of the victims by engaging in widespread visa fraud. Members of the organization assisted victims in obtaining fraudulent visas and travel documents through the use of false statements. Traffickers in Thailand directed victims to open bank accounts in Thailand or turn existing bank accounts over to the trafficking organization. Traffickers then funded those accounts to make it appear as if the victims had financial means, in turn making it more likely that their visa applications would be approved. Traffickers completed visa documents for the victims which included a multitude of false statements, including the false statement that the victims did not intend to engage in commercial sex activities once in the United States. Traffickers created false backgrounds for the victims, including fictitious occupations. At times, victims were instructed to enter into fraudulent marriages in Thailand in order to make it more likely that their visa applications would be approved. Traffickers coached the victims as to what to say during their visa interviews so as to avoid detection and ultimately receive a visa.

## The Force, Threats of Force, Fraud, and Coercion in the United States

14.     The victims typically entered the United States through Los Angeles, California.  Traffickers then sent the victims to various houses of prostitution in states across the United States, including to Minnesota, where the victims worked to pay down their bondage debts by engaging in numerous commercial sex transactions.

15.     Once in the United States, victims often found they were brought to the United States under false pretenses.  In Thailand, while the traffickers usually told the victims that they would engage in prostitution activities, the traffickers typically painted a rosy picture of life in the United States, with promises that the victims would pay off the bondage debt quickly, would be able to support their families back in Thailand, and would generally make a better life for themselves in the United States.  However, once the victims entered the United States, the terms of their "contract" often changed dramatically to favor the trafficking organization.  For instance, if a victim was paid $180 from a commercial sex transaction, only a portion of that money (approximately $100) would go to pay down her bondage debt.  The rest of the profits ($80) were paid to the "house boss," and a victim was allowed to keep little to none of the money she made engaging in commercial sex acts.  Additionally, victims were often charged for all manner of things, such as housing, travel, or even food, such that the ability to pay down the bondage debt was further reduced.

16.     While the traffickers portrayed themselves as kind and sympathetic during the recruitment process in Thailand, once a victim entered the United States, the traffickers often turned controlling, manipulative, threatening, and violent.  The

traffickers enforced the terms of the bondage debts through means of force, threats of force, fraud, and coercion, including abuse of legal process (such as threats to alert immigration officials) and threats of deportation. As a part of obtaining visa documents, members of the criminal conspiracy gathered personal information from the victims, including the location of the victims' families in Thailand. In the event that a victim became non-compliant or escaped the organization once in the United States, traffickers used this information to threaten the victim and/or her family and compel a victim to continue working or return to work.

17.     The criminal organization also controlled the victims by isolating them from the outside world. During the period of the bondage debts, the victims, who often spoke little to no English and were illegally present in the United States, lived in the houses of prostitution. They did not have control over their movements and were typically only allowed to leave the prostitution houses if they were accompanied by "runners," often "clients" of the organization who were compensated, in part, through sex with the victims. The victims were not allowed to decline commercial sex buyers who were physically or sexually abusive or otherwise unwanted. The victims were advertised for commercial sex transactions in any number of ways, including in online escort ads on websites such as backpage.com and eros.com. The victims were expected to have sex with numerous men—up to ten or more "Johns"— in a given day. At times, customers would be physically and sexually abusive with the victims, including acting out "rape fantasies" with the victims.

### Money Laundering Activities

18.     The organization dealt primarily in cash and engaged in rampant and sophisticated money laundering in order to promote, as well as to redistribute and conceal, profits from its sex trafficking business.

19.     The money launderers used a variety of methods at different times to avoid detection, conceal the source of the illegal proceeds, and promote the sex trafficking operation, including transferring proceeds back to Thailand and elsewhere. These methods included, but were not limited to, the following:

        a.      The organization used "funnel accounts" to launder and route the cash generated from commercial sex transactions at houses of prostitution across the United States to the money launderers, typically located in Los Angeles. When a victim entered the United States, she was often escorted by a member of the sex trafficking operation to a bank and instructed to open a bank account in her own name. After the victim opened the account, a member of the sex trafficking organization assumed control over the account, using it to avoid detection and evade reporting requirements while depositing illegal proceeds generated by the sex trafficking operation. These money launderers provided the account information to other members of the criminal conspiracy to coordinate the deposit of illegal proceeds, often in cash, throughout various cities in the United States.

        b.      The organization engaged in bulk cash smuggling, including the physical transport and mailing of illegal proceeds to Thailand. The bulk cash smuggling operation included money launderers recruiting other individuals to carry

large volumes of cash on their person when traveling to Thailand as well as hiding cash in a multitude of different items bound for Thailand, including clothing and dolls, in order to avoid detection.

        c.     The organization engaged in international wire transfers in order to transfer the illegal proceeds of the sex trafficking operation to Thailand and elsewhere outside the United States.

        d.     The organization used a hawala-based system to transfer illegal proceeds of the sex trafficking operation to Thailand and elsewhere outside the United States. The hawala system for moving money is based on trust and family association and typically involves the payment of money, via cash or other method, to an agent in one location who then instructs an associate in another location, often in another country, to pay the final recipient. The two intermediaries typically work together on an ongoing basis, each receiving and disbursing funds to and from individuals or accounts in his or her own location, and reconciling these credits/debits with the other intermediaries as necessary. The result is the movement of funds from one location to another without the need to actually transfer or wire the funds. This criminal organization moved millions of dollars in illegal proceeds generated from the sex trafficking scheme from the United States to Thailand and elsewhere outside the United States using this hawala-based system.

      20.     All in violation of Title 18, United States Code, Section 1594(c).

## COUNT 2
Sex Trafficking by Use of Force, Threats of Force, Fraud, and Coercion
18 U.S.C. § 1591

21.    The allegations contained in paragraphs 1 through 20 of this superseding indictment are re-alleged as if stated in full herein.

22.    From in or about April 2009 through in or about January 2010, in the State and District of Minnesota and elsewhere, the defendants,

**MICHAEL MORRIS,**
**a/k/a Bill, and**
**CHATARAK TAUFFLIEB,**
**a/k/a Maya,**

aiding and abetting one another and others, known and unknown to the grand jury, in and affecting interstate commerce, knowingly recruited, enticed, harbored, transported, provided, obtained, and maintained a person, namely, Victim A, and benefited, financially and by receiving something of value, from participation in a venture which engaged in the previously described acts, and knowing that force, threats of force, fraud, and coercion would be used to cause Victim A to engage in a commercial sex act, and attempted to do so, all in violation of Title 18, United States Code, Sections 1591(a), 1591(b)(1), 1594(a), and 2.

## COUNT 3
Conspiracy To Commit Transportation to Engage in Prostitution
18 U.S.C. § 371

23.    The allegations contained in paragraphs 1 through 22 of this superseding indictment are re-alleged as if stated in full herein.

24.    From in or about January 2009 through in or about May 2017, in the State and District of Minnesota and elsewhere, the defendants,

**MICHAEL MORRIS,**
a/k/a Bill,
**CHATARAK TAUFFLIEB,**
a/k/a Maya,
**PEERACHET THIPBOONNGAM,**
a/k/a Arm,
**PAWINEE UNPRADIT,**
a/k/a Fon,
a/k/a Jamjit Unpradit,
a/k/a Pawinee Kiertivadthananod,
**SAOWAPHA THINRAM,**
a/k/a Nancy,
a/k/a Kung,
**GREGORY ALLEN KIMMY,**
a/k/a Fat P,
**WILAIWAN PHIMKHALEE,**
a/k/a Pim,
a/k/a Paula,
a/k/a Mona,
a/k/a Chompoo,
**KANYARAT CHAIWIRAT,**
a/k/a Pan,
**NATCHANOK YUVASUTA,**
a/k/a NUT,
**THOUCHARIN RUTTANAMONGKONGUL,**
a/k/a Ann,
a/k/a Noiy,
**MATTHEW MINTZ,**
**MOHIT TANDON,**
**RICHARD ALEXANDER,**
**WARALEE WANLESS,**
a/k/a Wan,
a/k/a Waralee Duarte,
a/k/a Waralee Alcaraz,
**TANAKRON PATRATH,**
a/k/a Toom, and
**PANWAD KHOTPRATOOM,**
a/k/a Du,
a/k/a Pam,

conspired with one another and with others known and unknown to the grand jury to commit an offense against the United States and to defraud the United States, and

one or more did an act to effect the object of the conspiracy, that is, knowingly transporting any individual in interstate and foreign commerce with intent that such individual engage in prostitution and in any sexual activity for which any person can be charged with a criminal offense, in violation of Title 18, United States Code, Section 2421.

## THE PURPOSE OF THE CONSPIRACY

25.     The purpose of the conspiracy was for the sex trafficking organization to make money by arranging for Thai women to travel to the United States and, at various houses of prostitution in cities throughout the United States, engage in innumerable commercial sex acts.

## THE MANNER AND MEANS OF THE CONSPIRACY

26.     To achieve the purpose of the conspiracy, the defendants, together with others known and unknown to the grand jury, transported multiple victims, including but not limited to Victim A, Victim B, and Victim C, in interstate and foreign commerce, including in the State and District of Minnesota and elsewhere, with the intent that such individuals engage in prostitution and in any sexual activity for which any person can be charged with a criminal offense, and attempted to do so. In particular, the defendants, together with others known and unknown to the grand jury, committed the following acts.

## **OVERT ACTS**

### **Victim A**

27.    In or about June 2009, the sex trafficking organization transported Victim A from Bangkok, Thailand, to the United States, where Victim A was advertised for and engaged in prostitution activities at the direction of and for the benefit of the trafficking organization.   On or about October 3, 2014, the sex trafficking organization transported Victim A from Chicago, Illinois, to Minneapolis, Minnesota, where Victim A was advertised for and engaged in prostitution activities at the direction of and for the benefit of the trafficking organization.

### **Victim B**

28.    In or about August 2014, the sex trafficking organization transported Victim B from Bangkok, Thailand, to the United States, where Victim B was advertised for and engaged in prostitution activities at the direction of and for the benefit of the trafficking organization.   On or about October 31, 2014, the sex trafficking organization transported Victim B from Phoenix, Arizona, to Minneapolis, Minnesota, where Victim B was advertised for and engaged in prostitution activities at the direction of and for the benefit of the trafficking organization.

### **Victim C**

29.    In or about July 2013, the sex trafficking organization transported Victim C from Bangkok, Thailand, to the United States, where Victim C was advertised for and engaged in prostitution activities at the direction of and for the benefit of the trafficking organization.   On or about October 24, 2013, the sex

trafficking organization transported Victim C from Las Vegas, Nevada, to Minneapolis, Minnesota, where Victim C was advertised for and engaged in prostitution activities at the direction of and for the benefit of the trafficking organization.

30.     All in violation of Title 18, United States Code, Sections 371 and 2421.

## COUNT 4
Conspiracy To Engage in Money Laundering
18 U.S.C. § 1956

31.     The allegations contained in paragraphs 1 through 30 of this superseding indictment are re-alleged as if stated in full herein.

32.     From in or about 2009 through in or about May 2017, in the State and District of Minnesota, and elsewhere, the defendants,

**MICHAEL MORRIS,**
**a/k/a Bill,**
**CHATARAK TAUFFLIEB,**
**a/k/a Maya,**
**PEERACHET THIPBOONNGAM,**
**a/k/a Arm,**
**PAWINEE UNPRADIT,**
**a/k/a Fon,**
**a/k/a Jamjit Unpradit,**
**a/k/a Pawinee Kiertivadthananod,**
**SAOWAPHA THINRAM,**
**a/k/a Nancy,**
**a/k/a Kung,**
**GREGORY ALLEN KIMMY,**
**a/k/a Fat P,**
**WILAIWAN PHIMKHALEE,**
**a/k/a Pim,**
**a/k/a Paula,**
**a/k/a Mona,**
**a/k/a Chompoo,**
**KANYARAT CHAIWIRAT,**
**a/k/a Pan,**

19

**PORNTHEP SUKPRASERT,**
**a/k/a Ouu,**
**MULCHULEE CHALERMSAKULRAT,**
**a/k/a Mint,**
**BHUNNA WIN,**
**a/k/a Bhunna Siriangkhunwanish,**
**NATCHANOK YUVASUTA**
**a/k/a Nut,**
**NATTAYA LEELARUNGRAYAB,**
**PEERASAK GUNTETONG,**
**VEERAPON GHETTALAE,**
**THOUCHARIN RUTTANAMONGKONGUL,**
**a/k/a Ann,**
**a/k/a Noiy,**
**MATTHEW MINTZ,**
**MOHIT TANDON,**
**RICHARD ALEXANDER,**
**WARALEE WANLESS,**
**a/k/a Wan,**
**a/k/a Waralee Duarte,**
**a/k/a Waralee Alcaraz,**
**TANAKRON PATRATH,**
**a/k/a Toom,** and
**PANWAD KHOTPRATOOM,**
**a/k/a Du,**
**a/k/a Pam,**

unlawfully and knowingly combined, conspired, confederated and agreed with one another and others known and unknown to the grand jury to commit certain offenses under Title 18, United States Code, Sections 1956 and 1957, that is:

        a.    while knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, knowingly conducting and attempting to conduct such a financial transaction, affecting interstate and foreign commerce, which in fact involved the proceeds of specified unlawful activity, that is, Transportation for Prostitution, in violation of Title 18, United States Code, Section 2421, and Sex Trafficking, in violation of Title 18, United

States Code, Section 1591, with intent to promote the carrying on of such specified unlawful activity, and knowing that the transaction was designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of the specified unlawful activity and to avoid a transaction reporting requirement under State and Federal law, in violation of Title 18, United States Code, Section 1956(a)(1);

b.      knowingly transporting, transmitting, and transferring, and attempting to transport, transmit, and transfer, a monetary instrument and funds from a place in the United States to and through a place outside the United States, and vice versa, with the intent to promote the carrying on of specified unlawful activity, that is, Transportation for Prostitution, in violation of Title 18, United States Code, Section 2421, and Sex Trafficking, in violation of Title 18, United States Code, Section 1591, and while knowing that the monetary instrument and funds represented the proceeds of some form of unlawful activity and that such transfer was designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity and to avoid a transaction reporting requirement under State and Federal law, in violation of Title 18, United States Code, Section 1956(a)(2); and

c.      knowingly engaging and attempting to engage in a monetary transaction in criminally derived property that was of a value greater than $10,000 and derived from specified unlawful activity, in violation of Title 18, United States Code, Section 1957.

33.    All in violation of Title 18, United States Code, Section 1956(h).

## COUNT 5
Conspiracy To Use a Communication Facility to Promote Prostitution
18 U.S.C. § 371

34.    The allegations contained in paragraphs 1 through 33 of this superseding indictment are re-alleged as if stated in full herein.

35.    From in or about January 2009 through in or about May 2017, in the State and District of Minnesota and elsewhere, the defendants,

**MICHAEL MORRIS,**
a/k/a Bill,
**CHATARAK TAUFFLIEB,**
a/k/a Maya,
**PEERACHET THIPBOONNGAM,**
a/k/a Arm,
**PAWINEE UNPRADIT,**
a/k/a Fon,
a/k/a Jamjit Unpradit,
a/k/a Pawinee Kiertivadthananod,
**SAOWAPHA THINRAM,**
a/k/a Nancy,
a/k/a Kung,
**GREGORY ALLEN KIMMY,**
a/k/a Fat P,
**WILAIWAN PHIMKHALEE,**
a/k/a Pim,
a/k/a Paula,
a/k/a Mona,
a/k/a Chompoo,
**KANYARAT CHAIWIRAT,**
a/k/a Pan,
**NATCHANOK YUVASUTA,**
a/k/a Nut,
**THOUCHARIN RUTTANAMONGKONGUL,**
a/k/a Ann,
a/k/a Noiy,
**MATTHEW MINTZ,**
**MOHIT TANDON,**
**RICHARD ALEXANDER,**

**WARALEE WANLESS,**
**a/k/a Wan,**
**a/k/a Waralee Duarte,**
**a/k/a Waralee Alcaraz,**
**TANAKRON PATRATH,**
**a/k/a Toom, and**
**PANWAD KHOTPRATOOM,**
**a/k/a Du,**
**a/k/a Pam,**

conspired, with one another and with others known and unknown to the grand jury, to commit an offense against the United States and to defraud the United States, and one or more did an act to effect the object of the conspiracy, that is, knowingly using a facility in interstate and foreign commerce, specifically computers and cellular telephones, with intent to promote, manage, establish, and carry on acts to facilitate the promotion, management, establishment, and carrying on of an unlawful activity, namely, Transportation for Prostitution, in violation of Title 18, United States Code, Section 2421.

## THE PURPOSE OF THE CONSPIRACY

36.     The purpose of the conspiracy was for the sex trafficking organization to make money by arranging for women to travel from Bangkok, Thailand to the United States and, at various houses of prostitution in cities throughout the United States, engage in innumerable commercial sex acts for the financial benefit of the criminal organization.

## THE MANNER AND MEANS OF THE CONSPIRACY

37.     To achieve the purpose of the conspiracy, the defendants, together with others known and unknown to the grand jury, used computers and cellular telephones

with intent to promote, manage, establish, and carry on acts to facilitate the promotion, management, establishment, and carrying on of the prostitution activities of the victims of the sex trafficking operation, including but not limited to Victim A, Victim B, and Victim C. In particular, the defendants, together with others known and unknown to the grand jury, committed the following acts.

### OVERT ACTS

38.     On or about October 5, 2014, the sex trafficking organization posted an ad on backpage.com that contained escort-style photos of Victim A and advertised Victim A for commercial sex activities in Bloomington, Minnesota.

39.     On or about November 2, 2014, the sex trafficking organization posted an ad on backpage.com that advertised Victim B for commercial sex activities in Bloomington, Minnesota.

40.     On or about January 9, 2014, the sex trafficking organization posted an ad on backpage.com that contained escort-style photos of Victim C and advertised Victim C for commercial sex activities in Bloomington, Minnesota.

41.     All in violation of Title 18, United States Code, Sections 371 and 1952.

### COUNT 6
Unlicensed Money Transmitting Business
18 U.S.C. § 1960

42.     The allegations contained in paragraphs 1 through 41 of this superseding indictment are re-alleged as if stated in full herein.

43.     From at least in or about December 2013 through in or about May 2017, in the District of Minnesota and elsewhere,

### PEERACHET THIPBOONNGAM,
### a/k/a Arm,

unlawfully, willfully, and knowingly conducted, controlled, managed, supervised, directed, and owned all and part of an unlicensed money transmitting business affecting interstate and foreign commerce (a) without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor and a felony under State law, and (b) while failing to comply with the money transmitting business registration requirements under Section 5330 of Title 31, United States Code, and regulations prescribed under such section, to wit, THIPBOONNGAM received cash deposits in excess of approximately $1 million from multiple locations throughout the United States that contained houses of prostitution within this criminal network, including from Minnesota, and engaged in subsequent cash withdrawals and other transfers of those funds for the benefit of the criminal organization, without registering as a money transmitting business under federal law and without obtaining a California or Minnesota money transmitting license.

44.     All in violation of Title 18, United States Code, Sections 1960 and 2.

### COUNT 7
Unlicensed Money Transmitting Business
18 U.S.C. § 1960

45.     The allegations contained in paragraphs 1 through 44 of this superseding indictment are re-alleged as if stated in full herein.

46.     From at least in or about January 2014 through in or about May 2017, in the District of Minnesota and elsewhere,

## PORNTHEP SUKPRASERT,
### a/k/a Ouu,

unlawfully, willfully, and knowingly conducted, controlled, managed, supervised, directed, and owned all and part of an unlicensed money transmitting business affecting interstate and foreign commerce (a) without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor and a felony under State law, and (b) while failing to comply with the money transmitting business registration requirements under Section 5330 of Title 31, United States Code, and regulations prescribed under such section, to wit, SUKPRASERT received cash deposits in excess of approximately $1 million from multiple locations throughout the United States that contained houses of prostitution within this criminal network, including from Minnesota, and engaged in subsequent cash withdrawals and other transfers of those funds for the benefit of the criminal organization, without registering as a money transmitting business under federal law and without obtaining a California or Minnesota money transmitting license.

47.     All in violation of Title 18, United States Code, Sections 1960 and 2.

### COUNT 8
Unlicensed Money Transmitting Business
18 U.S.C. § 1960

48.     The allegations contained in paragraphs 1 through 47 of this superseding indictment are re-alleged as if stated in full herein.

49.     From at least in or about September 2013 through in or about May 2017, in the District of Minnesota and elsewhere,

26

### NATCHANOK YUVASUTA,
### a/k/a Nut,

unlawfully, willfully, and knowingly conducted, controlled, managed, supervised, directed, and owned all and part of an unlicensed money transmitting business affecting interstate and foreign commerce, to wit, TMH DAY SPA, (a) without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor and a felony under State law, and (b) while failing to comply with the money transmitting business registration requirements under Section 5330 of Title 31, United States Code, and regulations prescribed under such section, to wit, YUVASUTA received cash deposits in excess of approximately $650,000 into her personal accounts and her accounts doing business as TMH DAY SPA, from multiple locations throughout the United States that contained houses of prostitution within this criminal network, including from Minnesota, and engaged in subsequent cash withdrawals and other transfers of those funds for the benefit of the criminal organization, without registering herself or TMH DAY SPA as a money transmitting business under federal law and without obtaining California or Minnesota money transmitting licenses.

50.     All in violation of Title 18, United States Code, Sections 1960 and 2.

### **FORFEITURE ALLEGATIONS**

51.     The allegations contained in paragraphs 1 through 50 of this superseding indictment are re-alleged as if stated in full herein and are incorporated by reference for the purpose of forfeiture allegations.

52.    As the result of the offenses alleged in Counts 1 and 2 of this superseding

indictment, the defendants,

**MICHAEL MORRIS,**
a/k/a Bill,
**CHATARAK TAUFFLIEB,**
a/k/a Maya,
**PEERACHET THIPBOONNGAM,**
a/k/a Arm,
**PAWINEE UNPRADIT,**
a/k/a Fon,
a/k/a Jamjit Unpradit,
a/k/a Pawinee Kiertivadthananod,
**SAOWAPHA THINRAM,**
a/k/a Nancy,
a/k/a Kung,
**GREGORY ALLEN KIMMY,**
a/k/a Fat P,
**WILAIWAN PHIMKHALEE,**
a/k/a Pim,
a/k/a Paula,
a/k/a Mona,
a/k/a Chompoo,
**KANYARAT CHAIWIRAT,**
a/k/a Pan,
**NATCHANOK YUVASUTA,**
a/k/a NUT,
**THOUCHARIN RUTTANAMONGKONGUL,**
a/k/a Ann,
a/k/a Noiy,
**MATTHEW MINTZ,**
**MOHIT TANDON,**
**RICHARD ALEXANDER,**
**WARALEE WANLESS,**
a/k/a Wan,
a/k/a Waralee Duarte,
a/k/a Waralee Alcaraz,
**TANAKRON PATRATH,**
a/k/a Toom, and
**PANWAD KHOTPRATOOM,**
a/k/a Du,
a/k/a Pam,

shall forfeit the following property to the United States pursuant to Title 18, United States Code, Section 1594:

(1) any property, real or personal, involved in, used, or intended to be used to commit or to facilitate the commission of the offenses, and any property traceable to such property; and

(2) any property, real or personal, constituting or derived from, any proceeds obtained, directly or indirectly, as a result of the offenses, and any property traceable to such property.

53.     As the result of the offenses alleged in Counts 3 and 5 of this superseding indictment, the defendants,

**MICHAEL MORRIS,**
**a/k/a Bill,**
**CHATARAK TAUFFLIEB,**
**a/k/a Maya,**
**PEERACHET THIPBOONNGAM,**
**a/k/a Arm,**
**PAWINEE UNPRADIT,**
**a/k/a Fon,**
**a/k/a Jamjit Unpradit,**
**a/k/a Pawinee Kiertivadthananod,**
**SAOWAPHA THINRAM,**
**a/k/a Nancy,**
**a/k/a Kung,**
**GREGORY ALLEN KIMMY,**
**a/k/a Fat P,**
**WILAIWAN PHIMKHALEE,**
**a/k/a Pim,**
**a/k/a Paula,**
**a/k/a Mona,**
**a/k/a Chompoo,**
**KANYARAT CHAIWIRAT,**
**a/k/a Pan,**
**NATCHANOK YUVASUTA,**
**a/k/a NUT,**

**THOUCHARIN RUTTANAMONGKONGUL,**
**a/k/a Ann,**
**a/k/a Noiy,**
**MATTHEW MINTZ,**
**MOHIT TANDON,**
**RICHARD ALEXANDER,**
**WARALEE WANLESS,**
**a/k/a Wan,**
**a/k/a Waralee Duarte,**
**a/k/a Waralee Alcaraz,**
**TANAKRON PATRATH,**
**a/k/a Toom,** and
**PANWAD KHOTPRATOOM,**
**a/k/a Du,**
**a/k/a Pam,**

shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the violations of Title 18, United States Code, Sections 371 and 2421.

54.     As the result of the offenses alleged in Counts 4, 6, 7, and 8 of this superseding indictment, the defendants,

**MICHAEL MORRIS,**
**a/k/a Bill,**
**CHATARAK TAUFFLIEB,**
**a/k/a Maya,**
**PEERACHET THIPBOONNGAM,**
**a/k/a Arm,**
**PAWINEE UNPRADIT,**
**a/k/a Fon,**
**a/k/a Jamjit Unpradit,**
**a/k/a Pawinee Kiertivadthananod,**
**SAOWAPHA THINRAM,**
**a/k/a Nancy,**
**a/k/a Kung,**
**GREGORY ALLEN KIMMY,**
**a/k/a Fat P,**
**WILAIWAN PHIMKHALEE,**

a/k/a Pim,
a/k/a Paula,
a/k/a Mona,
a/k/a Chompoo,
**KANYARAT CHAIWIRAT,**
a/k/a Pan,
**PORNTHEP SUKPRASERT,**
a/k/a Ouu,
**MULCHULEE CHALERMSAKULRAT,**
a/k/a Mint,
**BHUNNA WIN,**
a/k/a Bhunna Siriangkhunwanish,
**NATCHANOK YUVASUTA,**
a/k/a Nut,
**NATTAYA LEELARUNGRAYAB,**
**PEERASAK GUNTETONG,**
**VEERAPON GHETTALAE,**
**THOUCHARIN RUTTANAMONGKONGUL,**
a/k/a Ann,
a/k/a Noiy,
**MATTHEW MINTZ,**
**MOHIT TANDON,**
**RICHARD ALEXANDER,**
**WARALEE WANLESS,**
a/k/a Wan,
a/k/a Waralee Duarte,
a/k/a Waralee Alcaraz,
**TANAKRON PATRATH,**
a/k/a Toom, and
**PANWAD KHOTPRATOOM,**
a/k/a Du,
a/k/a Pam,

shall forfeit to the United States pursuant to Title 18, United States Code, Section 982(a)(1), any property, real or personal, involved in any such offense, and any property traceable to such property.

55.     If any of the above-described property is unavailable for forfeiture within the definition of Title 21, United States Code, Section 853(p), the United States intends to forfeit substitute property pursuant to Title 21, United States Code,

Section 853(p) as incorporated by Title 18, United States Code, Section 982(b) and

Title 28, United States Code, Section 2461(c).

A TRUE BILL

_____          _____
ACTING UNITED STATES ATTORNEY        FOREPERSON